# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KELLY DAVID RICE,

                    Plaintiff,

v.

ANDREW SAUL, Commissioner
of Social Security

                    Defendant.

Case No. 1:19-cv-2665

JUDGE PAMELA A. BARKER

MAGISTRATE JUDGE
CARMEN E. HENDERSON

REPORT AND RECOMMENDATION

## I.    Introduction

Plaintiff, Kelly Rice, seeks judicial review of the final decision of the Commissioner of Social Security, Andrew Saul, denying his application for supplemental-security income ("SSI") under Title XVI of the Social Security Act. This matter is before me under 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Rice's application for SSI be AFFIRMED.

## II.   Procedural History

Rice's SSI application was filed on November 9, 2016. (Tr. of Proceedings before the Soc. Sec. Admin., ECF No. 11 at 184). The Ohio Division of Disability Determination (the "State Agency") initially denied his claim on February 24, 2017 (ECF No. 11 at 94-109), and again denied it on reconsideration on June 13, 2017. (ECF No. 11 at 111-27). On June 23, 2017, Rice requested a hearing before an ALJ. (ECF No. 11 at 145). ALJ Joseph Hajjar presided over Rice's hearing on July 11, 2018. (ECF No. 11 at 38-71). Rice appeared and testified on his behalf. (ECF No. 11 at 39). Ted Macy, a vocational expert, appeared and testified in that capacity. (ECF No. 11 at 39).

The ALJ found that Rice was not disabled in his written opinion, which was dated November 8, 2018. (ECF No. 11 at 17-30). Rice appealed the ALJ's decision to the Appeals Council, requesting that it review the ALJ's decision, but it denied his request on September 18, 2019. (ECF No. 11 at 6). This appeal followed on November 14, 2019. (ECF No. 1).

## III.  Relevant Background

### A.  Medical Evidence

#### 1.  Physical Impairments

Rice presented to the emergency department with abdominal-pain complaints on September 4, 2015 (ECF No. 11 at 494); October 12, 2015 (ECF No. 11 at 467); October 23, 2015 (ECF No. 11 at 410); October 27, 2015 (ECF No. 11 at 389); and November 3, 2015. (ECF No. 11 at 361). Rice then presented with chronic abdominal pain following an appendectomy on November 6, 2015. (ECF No. 11 at 290). His doctor observed that his abdomen was "soft" and his "bowel sounds [we]re normal." (ECF No. 11 at 291). He was assessed with chronic abdominal pain and monitored for controlled-substance abuse. (ECF No. 11 at 291). On November 13, 2015, Rice's doctor observed that Rice's abdomen was "disproportionate[ly tender] to expected level of discomfort with mild palpitation." (ECF No. 11 at 308). A second physician noted that Rice's pain did not appear to be related to his surgery. (ECF No. 11 at 308). His doctor ordered imaging, which showed only a "small fat-containing umbilical hernia." (ECF No. 11 at 315). Rice later presented with the same general symptoms on November 18, 2015 (ECF No. 11 at 335); November 29, 2015 (ECF No. 11 at 631); and December 24, 2015. (ECF No. 11 at 607).

Rice again presented to the emergency department on January 8, 2016, with abdominal-pain complaints and umbilical-drainage issues. (ECF No. 11 at 599-602). Rice underwent a one-stitch hernia-repair surgery that same day. (ECF No. 11 at 601-02). Postoperative medical imaging

showed only extraperitoneal changes (which were consistent with a standard herniorrhaphy) and no localized fluid collection or abscesses. (ECF No. 11 at 526).

Rice presented with intermittent periumbilical abdominal pain on October 17, 2016, noting "widespread erythema extending out from the umbilicus with associated burning/stinging pain," which was "relieved temporarily with mupirocin ointment but always comes back." (ECF No. 11 at 879). The doctor noted that Rice's abdominal area was "diffusely tender to even the faintest light touch—patient is constantly flinching and reports the area is 'sensitive.'" (ECF No. 11 at 879). Rice again presented with abdominal pain on November 18, 2016, asking about possible nerve damage and admitting to "frequently touching/rubbing the [incision' area." (ECF No. 11 at 899). On December 29, 2016, Rice was diagnosed with entrapment neuropathy, and his doctor administered a pain-relieving injection at the surgical site. (ECF No. 11 at 961). Rice noted on January 6, 2017, that the injection had helped for only one day. (ECF No. 11 at 984). Rice again stated that he felt pain to "superficial touch (lightly brushing the skin)." (ECF No. 11 at 985). Doctors again noted his abdominal sensitivity on March 9, 2017 (ECF No. 11 at 1026), and again on April 26, 2017. (ECF No. 11 at 1098). Rice underwent tomography imaging on May 8, 2017, which showed "no intra-abdominal abnormalities." (ECF No. 11 at 1142).

In September 2017, Rice received a saline injection via a differential epidural that gave Rice "a placebo effect," during which he experienced pain relief to a saline solution only. (ECF No. 11 at 1243). Later that month, Rice's doctors told him that his hernia surgery did not include a mesh placement. (ECF No. 11 at 1249). Rice was "hesitant to believe the recommendations of the[se] surgeons." (ECF No. 11 at 1249). Rice did not perform any physical therapy. (ECF No. 11 at 1249). Rice had additional medical images taken in October 2017; these images did not reveal any gastrointestinal-tract or soft-tissue issues or recurrent hernias. (ECF No. 1594).

3

Rice was diagnosed with a thoracic aortic aneurism on November 7, 2017. (ECF No. 11 at 1235). The aneurism was small in nature, it did not cause any objective symptoms, and the doctor did not limit Rice's activity in any way because of it. (ECF No. 11 at 1235).

2.     Mental Health Impairments

Rice has a history of periodic depression and purported suicidal ideations, much of which related to his abdominal pain. For example, Rice presented with periodic depression in September 2015 (ECF No. 11 at 257), and self-harm complaints in October 2015. (ECF No. 11 at 427). Rice felt as though he had low energy, was sad, and had lost much of his appetite. (ECF No. 11 at 271). Rice was admitted to the hospital on January 13, 2016, for suicidal ideations and depression. (ECF No. 11 at 549-51). He was diagnosed with a major depressive disorder without psychotic features. (ECF No. 11 at 550). He was discharged two days later without signs of depression; he had fair judgment; he had intact cognition; and he had appeared to be seeking pain medication. (ECF No. 11 at 550). In February, Rice reported not being depressed or anxious. (ECF No. 11 at 1146).

On October 10, 2016, Rice was diagnosed with unspecified anxiety disorder, unspecified opioid disorder, and major depressive disorder. (ECF No. 11 at 911). He had recently moved to a larger city, which caused some anxiety, but Rice denied self-harm thoughts, low energy, or concentration issues. (ECF No. 11 at 908). He was previously prescribed Cymbalta, but he discontinued its use on November 4, 2016. (ECF No. 11 at 924).

Rice noted severe depression on January 9, 2017 (ECF No. 11 at 1006), and anxiety on January 12. (ECF No. 11 at 1004). Rice felt depressed in March 2017 when he was told that his stomach pain was not surgical in nature. (ECF No. 11 at 1014). Rice refused psychiatric medications in May 2017—despite reporting worsening depression and anxiety—because they made him feel ill. (ECF No. 11 at 1115). His doctor did not believe that he was in "particular

4

distress" on that occasion. (ECF No. 11 at 1115). In July 2017, Rice reported no psychiatric symptoms. (ECF No. 11 at 1556). In October 2017, Rice was noted to have "significant problems with anxiety," but these issues were not specified. (ECF No. 11 at 1233). In May 2018, Rice presented with no anxiety or depression (ECF No. 11 at 1244), and in June 2018, Rice reported some depression but no anxiety. (ECF No. 11 at 1569).

### B. Testimonial Evidence

#### 1. Rice

Rice testified at the hearing. Rice stated that he walked to the hearing, noting that it took him "about 25 to 30 minutes" to arrive from his residence. (ECF No. 11 at 45). He stopped first at his methadone clinic. (ECF No. 11 at 45). Rice trained as an auto-body technician and was certified in that field. (ECF No. 11 at 46). He last worked in August or September 2016, serving at an Adult Rehabilitation Center. (ECF No. 11 at 46). Rice would transport heavy steel bins and donation bags by hand; he attributes his hernia problems to the work. (ECF No. 11 at 46). He worked part-time, and some of the bins and bags were "real[ly] heavy, 80 pounds, 50 pounds, something like that." (ECF No. 11 at 47).

Rice's application for benefits included a 2007 earnings statement from Quality Blow Molding, where he worked as a machine operator, then a hopper filler, and, finally, a floor person. (ECF No. 11 at 47). He was a machine operator for "about four, three to four months" of full-time work. (ECF No. 11 at 47). He made minimum wage there and had to carry about 30 pounds at a time; he was on his feet most of the time during the shift. (ECF No. 11 at 48). Rice worked as a hopper filler for about "five to six months," where he would carry about 50 pounds on occasion. (ECF No. 11 at 49). When he worked as a floor person, he would bring in materials, fill hoppers, and keep the various machines going. (ECF No. 11 at 49). He drove a forklift on occasion, a task

5

that required him to manually adjust the forklift's forks by hand. (ECF No. 11 at 50). He had to lift about 25 pounds in this role. (ECF No. 11 at 50). Rice worked there briefly, "a month, two months, three months," later on as a machine operator. (ECF No. 11 at 51). Rice also testified that he worked odd jobs, like mowing grass, as a self-employed person, over the years. (ECF No. 11 at 52). He would make about $1000 per month in that capacity and work for about eight months per year. (ECF No. 11 at 52).

In a typical day, Rice walks a few miles to a methadone clinic around 7:00 or 8:00 A.M. to get his medication. (ECF No. 11 at 52). He then walks back, but is "wiped out… [He] usually just stay[s] at home the rest of the day." (ECF No. 11 at 52). He tends to lay flat on his back to alleviate his abdominal pain. (ECF No. 11 at 53). Rice does not do any household chores, but he buys groceries about three times a week. (ECF No. 11 at 53). He washes his own laundry, but stated that he had not done so "lately," which Rice clarified as "[n]ot as often as [he] should. It's probably about once a month now." (ECF No. 11 at 53-54). He does not feel like doing laundry. (ECF No. 11 at 59). He transports his laundry by placing it in a plastic bag and dragging it to the laundry facilities in his building. (ECF No. 11 at 54). He does not transport too many clothes at one time. (ECF No. 11 at 54). He does not prepare hot foods: "I'm just a cereal and peanut butter and jelly person, just whatever… I'm more or less a vegetarian." (ECF No. 11 at 54). He avoids hot foods because he found himself going to the hospital after eating hot foods and meat because, he believes, it is difficult to digest. (ECF No. 11 at 59-60). He does not own a broom, and instead occasionally cleans messes with a wet rag—as Rice puts it, he doesn't "really do anything there to make it dirty… It's real[ly] easy to maintain." (ECF No. 11 at 54). Rice attends church near his methadone clinic and has a social community there. (ECF No. 11 at 55).

Rice has a history of illicit-drug dependency. He used heroin and prescription pills, last

using heroin in 2014. (ECF No. 11 at 55). He has frequented a methadone clinic since March 2018. (ECF No. 11 at 55). He previously was in a sub Oxone clinic. (ECF No 11 at 56).

Rice detailed the physical symptoms that, in his opinion, prevent him from working: "Physically, there's just every move I make with my stomach, put pressure on it, it just aggravates me even more, a lot of nausea with chronic pain. So[,] I'm usually not able" to work. (ECF No. 11 at 56). He feels a "tight feeling all the way across [his abdomen]," which intensifies if he touches it or puts additional pressure on it. (ECF No. 11 at 60). He feels pain-induced nausea about twice per week. (ECF No. 11 at 62). He rates the pain at a constant 8 out of 10 on a pain-sensitivity scale without medication and a 6 or 7 with medication. (ECF No. 11 at 62).

He discussed his mental health concerns, too: "I … wanted to jump off [of] the Carnegie Bridge a couple of times on my way to the methadone clinic, just jump right over… So, you know, it's just been … weighing on me because I can't do anything. I'm like an invalid now and it just … weighs on me." (ECF No. 11 at 56). Some days, Rice does not want to get out of bed, which he attributes to his mental health struggles and chronic pain. (ECF No. 11 at 59).

Sometimes, Rice walks around to relieve his boredom, "to loosen up a little bit, maybe good for [his] metabolism because [he lies] … around all time time." (ECF No. 11 at 57). Despite walking frequently, he "always" finds walking to be difficult. (ECF No. 11 at 57). In Rice's words, "I feel like every step I take …, I feel pain[,] but I just try to block it out, and I don't go very far at times, so I just—I know there's an air mattress waiting for me [at home,] so I can lay down and take my medication and just … lay down and try to … keep blocking [out] the pain…" (ECF No. 11 at 57). He feels pain from the first step; he takes breaks every quarter mile or so, which is about every five minutes. (ECF No. 11 at 57). He does not feel the energy to walk long distances. (ECF No. 11 at 58). He can stand "okay." (ECF No. 11 at 58). He stated that he could not lift at all:

Lifting is "pretty much out of the question…" because it puts pressure on his stomach. (ECF No. 11 at 58). He finds it difficult to lift his laundry bag. (ECF No. 11 at 58). He does not lift things around the kitchen. (ECF No. 11 at 58-59). He does not think that he could lift 10 to 20 pounds throughout a workday. (ECF No. 11 at 61).

> ### 2.    Vocational Expert Ted Macy

Ted Macy, a vocational expert hired by the State Agency to assist the ALJ in the hearing, stated that Rice had worked previously as a "plastic mold operator, DOT number 556.685.022. The DOT lists it as light and unskilled [work], as [Rice] did it, it may have gone into the medium [work] classification at times." (ECF No. 11 at 65). That was because he "handled different sizes of products, some of them may have been put to 30 pounds…" (ECF No. 11 at 65). He stated, too, that Rice had worked as a "plastics laborer," which is "DOT number 559.667-014, medium [work], it sounds like that's how he did it as he described it and unskilled, SVP 2." (ECF No. 11 at 65-66).

The ALJ posed to Macy the following hypothetical:

> Assume a hypothetical individual of [Rice]'s age and education and with the past jobs that you described. Further assume [that] this individual is limited as follows; this is a medium exertional hypothetical with the following additional limitations: this person can frequently stoop, crouch, and crawl; can never work at unprotected heights or near moving mechanical parts[,] and is limited to performing simple tasks and can tolerate occasional interaction with the public[.] Can this hypothetical individual perform any of the past jobs that Mr. Rice performed?

(ECF No. 11 at 66). Macy opined that the hypothetical individual could still perform Rice's past work as a plastics laborer. (ECF No. 11 at 66). He also opined that the hypothetical individual could perform other jobs. For example, the individual could be a wire worker, which is a light, unskilled job. (ECF No. 11 at 66). And at the medium exertional level, Macy opined that the individual could perform at least three representative jobs: (1) laundry worker; (2) packager; and

8

(3) stock selector. (ECF No. 11 at 67). Macy opined that there are many positions for these jobs in the national economy. (ECF No. 11 at 67). Macy also opined that the hypothetical individual could perform at least three other representative occupations: (1) wire worker; (2) electronics worker; and (3) electrical assembler. (ECF No. 11 at 68). Macy stated that his opinion was based on his experience and training and was consistent with the DOT. (ECF No. 11 at 68).

Macy opined that the hypothetical individual could not perform any of Rice's past relevant work at the sedentary level. (ECF No. 11 at 68).

Rice's counsel asked Macy "what tolerances there are in the unskilled employment [sector] regarding [being] off task." (ECF No. 11 at 69). Macy opined that "some employers are more lenient than others. There's some variance there, but I found [that] if an individual is off task more than 10% of the time outside of regular breaks and meal time, they're not going to last long…" (ECF No. 11 at 69). And "if it was 10% off task or less, I'd give you the same jobs I gave before with the same numbers but … I would say no jobs [satisfy the hypothetical] unless there was some special accommodations from the employer." (ECF No. 11 at 69). Macy opined that an individual who would be absent three or more days a month could not sustain gainful employment. (ECF No. 11 at 69).

The ALJ then asked Macy to consider the hypothetical again, but to reduce the exertional level to "light." (ECF No. 11 at 67). Macy opined that the individual could perform Rice's past work as a plastic mold operator. (ECF No. 11 at 68).

### C.  Opinion Evidence

#### 1.    Laster's Mental Functional-Capacity Assessment

Laster submitted a Mental Impairment Questionnaire, dated June 7, 2018, for Rice's hearing. (ECF No. 11 at 1205-06). Laster noted her weekly counseling relationship with Rice;

Rice's major-depressive-disorder diagnosis; Rice's lack of prescribed medications and, thus, resulting medications side effects; Rice's clinical findings of "severe[] depressive episodes … [with] instances of suicidal ideations"; and that Rice's impairments had lasted at least twelve months. (ECF No. 11 at 1205).

Laster then answered a series of questions that were designed to help to determine Rice's "ability to do work-related activities on a day to day basis in a regular work setting." (ECF No. 11 at 1205 (emphasis omitted). The series contained 20 total questions across four core areas of functioning: (1) sustained concentration and persistence; (2) understanding and memory; (3) social interaction; and (4) adaptation. (ECF No. 11 at 1205-06). Laster was asked to rate Rice's ability on a five-step scale: (1) unlimited or very good (undefined); (2) limited but satisfactory (undefined); (3) seriously limited, but not precluded (one's "ability to function in this area is less than satisfactory, but not precluded in all circumstances"); (4) unable to meet competitive standards (one "cannot satisfactorily perform th[e] activity independently"); and (5) no useful ability to function (one "cannot perform this activity in a regular work setting"). (ECF No. 11 at 1205).

Concerning Rice's sustained concentration and persistence limitations, Laster rated as seriously limited Rice's ability to maintain attention and concentration for extended periods, perform activities within a schedule; manage regular attendance and be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number of length of rest periods. (ECF No. 11 at 1205). Laster rated as limited but satisfactory Rice's ability to: carry out very short and simple instructions, carry out detailed instructions, and sustain an ordinary routine

10

without special supervision. (ECF No. 11 at 1205).

Concerning Rice's understanding and memory limitations, Laster rated as seriously limited Rice's ability to remember locations and work-like procedures and understand and remember detailed instructions. (ECF No. 11 at 1206). She rated as limited but satisfactory Rice's ability to understand and remember very short and simple instructions. (ECF No. 11 at 1206).

Concerning Rice's social interaction limitations, Laster rated as seriously limited Rice's ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (ECF No. 11 at 1206). She rated as limited but satisfactory Rice's ability to ask simple questions or request assistance and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (ECF No. 11 at 1206).

Concerning Rice's adaptation limitations, Laster rated as seriously limited Rice's ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. (ECF No. 11 at 1206). She rated as limited Rice's ability to be aware of normal hazards and take appropriate precautions. (ECF No. 11 at 1206).

Finally, Laster stated that she anticipated that Rice's "impairments or treatments would cause [him] to be absent from work … several times a month [; it] could be weeks depending on [his] mental state." (ECF No. 11 at 1206). When asked "[o]n average, how much of an 8-hour work day do you anticipate the symptoms of [Rice's] impairments would cause [him] to be off task for performing job tasks," Laster stated that Rice had "[b]een out of work for the past two years." (ECF No. 11 at 1206).

11

2. Fetsko and Vargo's Physical Functional Assessment

Lauren Fetsko, D.O., resident under Mary Vargovar, M.D., at MetroHealth System in Cleveland, Ohio, completed on August 28, 2018, a new-patient Functional Capacity Assessment for Rice's hearing. (ECF No. 11 at 1592-98). Fetsko noted that Rice was referred specifically for a physical functional-capacity assessment related to his chronic abdominal pain. (ECF No. 11 at 1592). Discussing Rice's medical history, Fetsko noted that Rice "had been seen in the [emergency department] for his abdominal pain" and that he "has been evaluated by general surgeons and pain management physicians." (ECF No. 11 at 1592). He has received lidocaine injections in his abdomen, but has not "tried a[n abdominal] support belt since th[e] injury." (ECF No. 11 at 1592). She noted, too, that Rice was "found to have a dilated thoracic ascending aorta," which a cardiologist would evaluate further. (ECF No. 11 at 1592).

Fetsko described Rice's pain as persisting for about two years and located to the right of the umbilicus without radiation, while the left-lower and right-lower stomach quadrants were sensitive to touch. (ECF No. 11 at 1592). Rice described the pain as sharp and stabbing, and worse with certain activities, such as walking, lifting, coughing, sneezing, and eating, and he experienced nausea each morning. (ECF No. 11 at 1592-93). Rice told Laster that the pain was alleviated by medications, heat baths, and massages. (ECF No. 11 at 1592). Rice scored the pain a seven out of ten (with ten as most severe). (ECF No. 11 at 1593). Rice reported to Fetsko that he could stand for about 25 minutes at a time, sit for 30 minutes before having to move around, walk for four to six blocks, lift a gallon of milk, bend forward to pick up objects, twist, stoop, and crawl. (ECF No. 11 at 1593). He reported that he could not squat. (ECF No. 11 at 1593). Rice could "ambulate without [assistive] devices and perform activities of daily living at an independent level," but he reported that he was "intermittently bed ridden due to pain" with "good and bad days." (ECF No.

12

11 at 1595).

Fetsko's tests showed that Rice could lift 10 pounds at the waist level with no significant pain, but that greater weight would require increased effort. (ECF No. 11 at 1597). Fetsko confirmed that Rice could not squat. (ECF No. 11 at 1597). From this, Fetsko opined that Rice could "tolerate lifting 5-10 [pounds] at the waist level frequently and 20 [pounds] at the waist level occasionally." (ECF No. 11 at 1597). She noted that Rice was experiencing "general deconditioning." (ECF No. 11 at 1597). Fetsko recommended that Rice consider physical therapy to "focus on overall strengthening and conditioning … [in particular] abdominal strengthening. [He] could also consider an abdominal support [belt] … when he is performing lifting tasks." (ECF No. 11 at 1597).

Vargo oversaw and participated in Rice's assessment. (ECF No. 11 at 1597-98). She endorsed Fetsko's notes and conclusions. Vargo noted that it is "[d]ifficult to get a precise idea of [Rice's] physical tolerances as his performance seems [to be] symptom-limited (pain, mood)." (ECF No. 11 at 1598).

### 3.     State Agency Consultants' Mental Functional-Capacity Assessments

Carl Tishler, Ph.D., assessed Rice's mental impairments and functional capacity on February 23, 2017, for the State Agency during its initial review. (ECF No. 11 at 94-109). Tishler found that Rice's affective disorders and anxiety disorders were severe impairments, but his substance-addiction disorders and personality disorders were non-severe impairments. (ECF No. 11 at 102). Tishler considered Rice's depressive, bipolar, and related disorders under Listing 12.04; anxiety and obsessive-compulsive disorders under Listing 12.06; and personality and impulse-control disorders under Listing 12.08. (ECF No. 11 at 102). He considered them each under the *paragraph B* criteria. (ECF No. 11 at 102). He concluded that Rice's abilities to (1) understand,

13

remember, and apply information; (2) interact with others; and (3) concentrate, persist, or maintain pace were each moderately impaired. (ECF No. 11 at 102). He concluded that Rice's ability to adapt or manage himself was mildly impaired. (ECF No. 11 at 102).

Tishler noted that one or more of Rice's impairments reasonably could be expected to produce his pain or other symptoms. (ECF No. 11 at 103). In Tishler's opinion, Rice's statements about the intensity, persistence, and functionally limiting effects of those symptoms could not be substantiated by only objective medical evidence. (ECF No. 11 at 103). Tishler thought that Rice's ADLs, statements made to medical sources, and longitudinal treatment records were the most informative in assessing his statements. (ECF No. 11 at 103). And Tishler concluded that Rice's statements were "fully consistent" with the medical and non-medical evidence in the file, noting that Rice "alleges issues with staying focused[,] which is consistent with [the] mild religious preoccupation noted on exam[,] as well as tangentially at times and anxious presentation." (ECF No. 11 at 104).

Concerning Rice's understanding, remembering, and applying information limitations, Tishler noted that Rice's ability to remember locations and work-like procedures and ability to understand and remember very short and simple instructions were "not significantly limited." (ECF No. 11 at 106). Tishler rated Rice's ability to understand and remember detailed instructions as "moderately limited," noting that Rice "can understand and remember … simple directions and detailed discussions with oral and written reminders (average intelligence)." (ECF No. 11 at 106).

Concerning Rice's sustained concentration and persistence limitations, Tishler noted that Rice was "not significantly limited" in his ability to carry out very short or simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without supervision; and work in coordination

14

with or in proximity to others without being distracted by them; make simple work-related decisions. (ECF No. 11 at 106). Tishler rated as "moderately limiting" Rice's ability to carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (ECF No. 11 at 106). Tishler explained these memory-related conclusions by stating that Rice "can carry out simple directions and detailed directions with oral and written reminders (average activity, average EC, thoughts mildly concrete[,] neutral mood, full affect[,] mild religious preoccupation[,] average intelligence)." (ECF No. 11 at 106).

Concerning Rice's social-interaction limitations, Tishler rated as "not significantly impaired" Rice's ability to ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and [] adhere to basic standards of neatness and cleanliness. (ECF No. 11 at 106-07). Tishler rated as "moderately limited" Rice's ability to interact appropriately with the general public. (ECF No. 11 at 107). Tishler summarized this category by stating that Rice "can have brief and occasional contact with the general public. [He] can interact with coworkers and supervisors (average EC, mild religious preoccupation, no aggressiveness, well groomed). (ECF no. 11 at 107).

Tishler concluded that Rice had no adaptation limitations. (ECF No. 11 at 107). He supported that conclusion by stating that Rice "can adapt to changes in the work setting (cooperative behavior, pleasant during assessment)." (ECF No. 11 at 107).

Irma Johnston, Psy.D., reviewed Rice's mental impairments for the State Agency at the reconsideration stage, authoring her opinion on June 9, 2017. (ECF No. 11 at 111-27). Johnston

reviewed medical records from November 2015 to June 2017. (ECF No. 11 at 113-18). She too found that Rice's affective disorders and anxiety disorders were severe impairments. (ECF No. 11 at 120). She considered the same listings as had Tishler and rated Rice's *paragraph B* criteria the same way, too. (ECF No. 11 at 120). Johnston also noted that Rice's consistency regarding symptom-related limitations was fully consistent, explaining that Rice "alleges issues with staying focused[,] which is consistent with mild religious preoccupation noted on exam as well as tangentiality at times and anxious presentation. (ECF No. 11 at 121). Johnston rated Rice's limitations in the same manner as had Tishler. (ECF No. 11 at 123-25). She too concluded that the 2016 residual functional capacity ("RFC") was inappropriate because "the new file does have new and material changes. The [original RFC] is not being adopted because of the worsening of [Rice's] psych[iatric] limitations. He has had a psych[iatric] IP stay and dx of anxiety and depression." (ECF No. 11 at 125).

> 4.    State Agency Consultants' Physical Functional-Capacity Assessments

William Bolz, M.D., assessed Rice's disability claim on February 23, 2017, for the State Agency during its initial review. (ECF No. 11 at 94-109). He reviewed Rice's medical records from November 2015 through January 2017, (ECF No. 11 at 95-98). Bolz found that Rice's hernias were non-severe impairments. (ECF No. 11 at 102). Concerning Rice's RFC, Bolz concluded that Rice had exertional limitations. He stated that Rice could occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; stand or walk (with normal breaks) about 6 hours in an 8-hour workday; and push or pull without restrictions (other than lifting or carrying restrictions). (ECF No. 11 at 104). He also opined that Rice had no postural, manipulative, visual, or communicative limitations. (ECF No. 11 at 104). Although Bolz stated that Rice's exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and aerosol particulates was unlimited, he also

stated that Rice should avoid all exposure to hazards (machinery, heights, etc.). (ECF No. 11 at 104-05). Bolz explained his RFC opinion by referencing Rice's unsuccessful 2016 SSI claim:

> I have looked at the final findings of 3/13/2016 and find that the new file does have new and material changes. The [prior decision's RFC] is not being adopted because [Rice] has a hernia that was not mentioned in [the decision]. This being said this hernia, along with other impairments mentioned in [the original RFC,] such as abdominal pain and Hepatitis C, do not cause more than a mild limitation to [Rice]. However, [Rice] still has abdominal tenderness on exam and tx for this pain.

(ECF No. 11 at 105).

Because Bolz did not have sufficient information about Rice's past relevant work, Bolz instead proceeded to consider Rice's ability to perform other work.[1] (ECF No. 11 at 108). Bolz opined that Rice was not limited to unskilled work because of his impairments. (ECF No. 11 at 108). He determined that the seven physical-RFC factors—lifting/carrying, standing, walking, sitting, pushing, pulling—indicated that Rice could perform, at maximum, medium-exertional-capacity work. (ECF No. 11 at 108). He opined that Rice could perform at least three representative job that exist in significant number in the national economy: (1) 969.687-014 Ice Maker, Skating Rink; 962.687-014 Film Loader; and 954.587-010 Water-Filter Cleaner. (ECF No. 11 at 108). Based on this finding, Bolz concluded that Rice was not disabled under the regulations. (ECF No. 11 at 109).

---

[1] "(h) Expedited process. If we do not find you disabled at the third step, and we do not have sufficient evidence about your past relevant work to make a finding at the fourth step, we may proceed to the fifth step of the sequential evaluation process. If we find that you can adjust to other work based solely on your age, education, and the same residual functional capacity assessment we made under paragraph (e) of this section, we will find that you are not disabled and will not make a finding about whether you can do your past relevant work at the fourth step. If we find that you may be unable to adjust to other work or if § 404.1562 may apply, we will assess your claim at the fourth step and make a finding about whether you can perform your past relevant work." 20 C.F.R. § 404.1520(h).

Anton Freihofner, M.D., reviewed Rice's file for the State Agency during its reconsideration, authoring his opinion on June 12, 2017. (ECF No. 11 at 111-27). Freihofner reviewed medical records from November 2015 to June 2017. (ECF No. 11 at 113-18). He too determined that Rice's substance-addiction disorders were non-severe impairments, but he concluded that Rice's hernia was a severe impairment. (ECF No. 11 at 120). Freihofner, too, concluded that Rice could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk and stand for about 6 hours in an 8-hour work day, and push or pull without limitations. (ECF No. 11 at 122). He determined that Rice had no postural, manipulative, visual, or communicative limitations. (ECF No. 11 at 122). And Rice's only environmental limitation was to hazards (machinery, heights, etc.), which he was to avoid. (ECF No. 11 at 123). Concerning the hernia, Freihofner noted that it "do[es] not cause more than a mild limitation to [Rice]. However, [he] still has abdominal tenderness on exam and tx for this pain." (ECF No. 11 at 123). Freihofner concluded that Rice could do the same three representative occupations that exist in significant number in the national economy as had Bolz. (ECF No. 11 at 126). Ultimately, Freihoner also concluded that Rice was not disabled. (ECF No. 11 at 127).

## IV.    The ALJ's Decision

As is relevant here, the ALJ issued the following findings of fact:

> 2. The claimant has the following severe impairments: hernias and abdominal pain, a depressive disorder, and an anxiety disorder…
>
> …
>
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1…
>
> …

18

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c) except the claimant has the residual functional capacity to lift, carry, push or pull 50 pounds occasionally[] and 25 [pounds] frequently. The claimant can sit for six hours out of an eight-hour day. The claimant can stand and walk for six hours out of an eight-hour day. The claimant can frequently stoop, crouch, or crawl. The claimant cannot work at unprotected heights or around moving mechanical parts. The claimant can understand, remember, and carry out simple tasks, and can occasionally interact with the public.

…

5. The claimant is capable of performing past relevant work as a Plastic mold operator (DOT 556.685-022). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity…

…

6. The claimant has not been under a disability, as defined in the Social Security Act, since November 2, 2016, the date the application was filed…

(ECF No. 11 at 21-30).

## V.     Law and Analysis

### A.  Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is "more than a scintilla" of relevant evidence; a reasonable person "might accept [it] as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence; if the Commissioner's findings as to any fact are supported by substantial evidence, then those findings are conclusive. 42 U.S.C. § 405(g); *see*

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). The decisive question is whether the ALJ's conclusions are "substantially supported in the record." *Rogers*, 486 F.3d at 241. If so, then the court must affirm the Commissioner's findings, even if the court does not agree with the Commissioner's decision, or substantial evidence exists to support an alternative result. *Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without the court second guessing him. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Despite this deference, a court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards—"fails to follow its own regulations"—unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006). Legal error is harmless if the "error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* And the court will not remand a case for further administrative proceedings absent prejudice on the merits or a deprivation of substantial procedural rights. *Rabbers v. Comm'r Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009). Similarly, if the ALJ failed to "build an accurate and logical bridge between the evidence and the result," then the court cannot uphold the ALJ's decision, even one supported by substantial evidence. *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (citing *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)). This and other 6th Circuit District

20

Courts follow *Sarchet*'s logical-bridge requirement[2] because it ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Laster's and Fetsko and Vargo's Opinions

Rice broadly challenges the ALJ's consideration of "the evidence in this matter[,] including the medical findings and opinions." (ECF No. 13 at 12) (formatting edited). Rice objects to the ALJ giving "only some weight" to Laster's opinion—when he gave greater weight to the State Agency psychological consultants' opinions—despite Laster and Rice having a long-term counseling relationship. (ECF No. 13 at 14-15). Rice also objects to the ALJ giving greater weight to the State Agency's physical consultants' opinions of his physical impairments than he did to

---

[2] *E.g. Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

Fetsko and Vargo's opinion of it, noting that Fetsko and Vargo examined him, while the State Agency's physical consultants reviewed only his medical records—and only those available through June 2017. (ECF No. 13 at 14). In both cases, Rice contends that the ALJ's conclusions lack substantial evidence and, thus, must be reversed or remanded. (ECF No. 13 at 12-16).

### 1. Laster's Mental Assessment

Rice challenges the weight accorded to Laster's opinion. (ECF No. 13 at 11-12). As a preliminary matter, Rice asserts that "20 C.F.R. § 416.927 requires an ALJ to give greater weight to treating source opinion, some weight to non-treating source opinions and to explain fully why any medical source opinion is rejected." (ECF No. 13 at 12). That is not the case: ALJs are required to give controlling weight only to opinions from treating sources. 20 C.F.R. § 416.927(c). As the ALJ noted, Laster is not a treating source because she is not an "acceptable medical source" under 20 C.F.R. § 416.902(a). Thus, the ALJ was not required to give Laster's opinion controlling weight. Nor was she required to give "good reasons" for the weight she gave to Laster's opinion. *See Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("[W]e will always give good reasons in [its] notice of determination or decision for the weight [it] give[s to a claimant's] treating source's medical opinion.").

Instead, Laster's opinion is one from a "health care provider[] who [is] not [an] acceptable medical source[]." Soc. Sec. Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006) (*rescinded by* Recision of Social Security Rulings 96-2p, 96-5p, and 06-03p, 2017 WL 3928298 (S.S.A. Mar.

27, 2017).[3] In considering opinion evidence from non-acceptable medical sources, an ALJ may consider the six factors at 20 C.F.R. § 416.927(c): (1) the length and frequency of the relationship; (2) the opinion's consistency with other admitted evidence; (3) the opinion's supporting evidence; (4) the opinion's explanation; (5) the provider's specialty or area of expertise related to the individual's impairments; and (6) any other factors that tend to support or refute the opinion. 20 C.F.R. § 416.927(c); SSR 06-03p. But the ALJ does not need to do so in a rigid manner, as the "factors represent [only] basic principles that apply to the consideration of all opinions from medical sources who are not acceptable medical sources." SSR 06-03p. The ALJ has to consider only the factors that are relevant to the facts in the case; if he "adjudicate[s] [the claim] on its own merits based on a consideration of the probative value of the opinions" and substantial evidence supports the weight he accorded to the at-issue evidence, then the ALJ's weight determination will stand. SSR 06-03p. Although not entitled to controlling weight under 20 C.F.R. § 416.927(c), this kind of evidence is "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p.

An ALJ's narrative concerning the weight accorded to opinion evidence can be sufficient even though it is "brief" (*Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009)), "indirect[]" (*Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 471 (6th Cir. 2006)), or implied. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that …an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts."). If the ALJ narrates the conflicting medical evidence

---

[3] SSR 96-2p was prospectively rescinded on March 27, 2017, so it controls Rice's case.

elsewhere in the record, then the ALJ is not required to restate it when explaining how a treating source's opinion is inconsistent with that evidence. *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016).

The ALJ's decision to accord "only some weight" to Laster's opinion is supported by substantial evidence. Initially, the ALJ noted that Laster was not an acceptable medical source and, thus, unable to offer "a medical opinion or make a diagnosis"; instead, her opinion could "be used only to show the severity of [Rice's] impairments and how they affect [his] ability to function." (ECF No. 11 at 26). Then, the ALJ noted that Laster's opinion was not consistent with the State Agency's consultants' opinions; unlike Laster, the consultants opined that Rice could "carry out simple and detailed directions with oral or written reminders, and could have brief interactions and occasional contact with the general public." (ECF No. 11 at 27). Earlier in the decision, the ALJ narrated Rice's mental-health-related medical evidence and noted the periodic, on-and-off nature of Rice's symptoms and treatment-seeking actions. (ECF No. 11 at 26). For example, the ALJ discussed Rice's brief 2016 hospitalization and his positive presentation on discharge; Rice's increased anxiety but lack of self-harm notions or concentration issues after moving to a larger city; frequent but imprecisely triggered panic attacks; and occasional absences of anxiety or depressive symptoms. (ECF No. 11 at 26).

Collectively, this narrative demonstrates that the ALJ reviewed the entire record and relied on it in making his determination of Rice's mental health limitations. His conclusion that Rice requires a limitation to simple tasks and occasional public contact logically flows from that discussion. Although Rice reads the objective evidence differently and, thus, believes that Laster's opinion is fully supported by it (ECF No. 13 at 12-13), the ALJ here acted within his zone of choice after properly reviewing the medical evidence and Laster's opinion. His choice is supported by

substantial evidence, as "a reasonable mind might accept the relevant evidence as adequate to support" his conclusion. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 710 (6th Cir. 2013).

Rice inferentially contends that the ALJ selectively parsed the medical record—cherry-picking it to support a particular outcome—in failing to explicitly discuss Rice's one-day hospitalization for suicide ideations. (ECF No. 13 at 13; ECF No. 15 at 3). Although he did not fully flesh it out, Rice implies that the ALJ's narrative demonstrates that the ALJ did not consider this piece of evidence. An ALJ cannot selectively parse various medical reports to suit a pre-determined outcome. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014). In *Gentry*, the ALJ's error was "failing to address certain portions of the record"—the ALJ omitted all "evidence of a continuing illness that was not resolved despite use of increasingly serious and dangerous medications," and ignored "the record evidence supporting a finding that [the claimant] had extensive skin lesions for at least 3 months, despite continuing treatment." *Id.* at 724-25. That oversight caused the ALJ to not properly determine whether the claimant met certain disability listings. *Id.* But that is not the case here. Although the ALJ did not explicitly state that Rice was briefly hospitalized for suicidal ideations in May 2017, he directly referenced the treatment notes from that visit (found at Exhibit 22F) and noted that Rice "alleged depression and anxiety, with thoughts of self-harm, but asserted that all psychiatric medications made him sick and he did not want to be on them." (ECF No. 11 at 26 (referencing ECF No. 11 at 1115)). Because the ALJ reviewed Rice's hospitalization and noted it in the decision, Rice's concern that the ALJ parsed the record is unfounded.

Rice alternatively contends that the ALJ could not give greater weight to the State Agency's consultants' opinions than he did to the opinion of Laster—who had an established relationship with Rice. (ECF No. 13 at 15). That is also unpersuasive. The Sixth Circuit holds that

giving greater weight to a State Agency consultant's opinion over an examining or treating source is "not, in and of itself, error." *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007). Instead, "[i]n appropriate circumstances, opinions from State [A]gency medical ... consultants ... may be entitled to greater weight than the opinions of treating or examining sources." *Id.* And if the claimant augments the medical evidence in the record after the initial or reconsideration stages, then there must be "some indication that the ALJ at least considered" this difference and the record's new facts "before giving greater weight to an opinion that is not based on a review of a complete case record." *Id.*

Here, the ALJ noted that Tishler's and Johnston's opinions were those from "non-examining expert sources" because they had not examined Rice. (ECF No. 11 at 27). He also noted that Rice's "sporadic treatment and inconsistent reporting of symptoms" aligned with Tishler's and Johnston's assessments of his claim, which justifies giving their opinions significant weight. (ECF No. 11 at 27). Despite this, Rice cites to *Gayheart v. Comm'r of Soc. Sec.* for the rigid proposition that "an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination … and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship." (ECF No. 13 at 15 (quoting 710 F.3d 365, 375 (6th Cir. 2013)). But Rice omits the first four words of that quote: "As a general matter…" *Gayheart*, 710 F. 3d at 375. As discussed in *Fisk*, according greater weight to a State Agency consultant's opinion is not itself legal error. Rice's only critique of the weight accorded to Tishler's and Johnston's opinions is that "the ALJ erroneously disregarded the opinion of the *treating* counselor…" (ECF No. 13 at 15 (emphasis

added)). But Laster is not a treating source.[4] Because Rice has not shown that the ALJ's reliance

on Tishler's and Johnston's opinions was error, and a logical bridge supports the conclusions that

the ALJ drew from those opinions, the Court should not disturb the weight accorded to either

Laster's or Tishler's and Johnston's opinions.

2.      Fetsko and Vargo's Physical Assessment

As Rice sees it, the ALJ should have relied on Fetsko and Vargo's opinion because it is a

physical evaluation of Rice's performance in various activities, rather than a review of his medical

records alone. (ECF No. 13 at 14-15). To that end, Rice again incorrectly asserts that "'an opinion

from a medical source who has examined a claimant is given more weight than that from a source

who has not performed an examination…" (ECF No. 13 at 15 (quoting *Gayheart*, 710 F.3d at 375).

Initially, Fetsko and Vargo's opinion is not one from a treating source,[5] so the ALJ was not

obligated to consider it for controlling weight. And as with Tishler's and Johnston's opinions, the

ALJ here can properly accord greater weight to Fetsko and Vargo's opinion, so long as he indicated

that he at least considered the record's facts that post-date the consultants' review. *Fisk*, 253 F.

App'x at 585. The ALJ did so: He noted that he "add[ed] some limitations not suggested by the

[S]tate [A]gency doctors based on the claimant's subjective reporting," which occurred after Bolz

---

[4] The regulations define treating source as "your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2). Although Rice has an ongoing treatment relationship with Laster, Laster is not an acceptable medical source under 20 C.F.R. § 404.1502(a); thus, she cannot be a treating source.

[5] The regulations define treating source as "your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation *and* who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2) (emphasis added). A single consultative visit does not satisfy that regulation. *Barker v. Shalala*, 40 F. 3d 789, 794 (6th Cir. 1994). As Fetsko and Vargo note, their first and only encounter with Rice was August 21, 2018, the date on which they assessed his physical functional capacity. (ECF No. 11 at 1592).

and Freihofner reviewed Rice's case file. (ECF No. 11 at 27). Thus, giving greater weight to Bolz's and Freihofner's opinions is not, on its own, error because the ALJ considered the differences in the record and added restrictions for Rice's post-review subjective statements.

Rice also asserts that the ALJ misread or misrepresented Fetsko and Vargo's statements. For example, Rice points out that Fetsko and Vargo noted that his "'tolerance to lifting and other exertional activities appears to be self-limited by his chronic abdominal pain.'" (ECF No. 13 at 14-15 (quoting ECF No. 11 at 1597)). And Rice notes that Fetsko and Vargo could not "get a precise idea of 'physical tolerances[,] as his performance seem[ed] symptom-limited." (ECF No. 13 at 14 (quoting ECF No. 11 at 1598)). Rice believes that those statements support his claim here; the ALJ, however, read these passages to mean that Rice "may have given a poor effort on the strength tests." (ECF No. 11 at 27).

Along those lines, the ALJ noted various discrepancies between the opinion and the record evidence:

> [Rice] reported significant pain relief from an [intravenous] injection of saline solution [during a differential epidural] as opposed to actual pain medication. Computed tomography imaging of [Rice]'s abdomen, in May 2017, showed no intra-abdominal abnormalities. Imaging in October of 2017[] did not show abnormalities of the gastrointestinal tract or soft tissues[,] and there were no recurrent hernias.

(ECF No. 11 at 27). When read together, a reasonable mind might accept the evidence noted in the ALJ's narrative as adequate support for the conclusion that Rice's post-hernia-surgery pain does not limit him to the degree that Fetsko and Vargo opined; thus, it is supported by substantial evidence. *Rogers*, 486 F.3d at 241. That conclusion flows from multiple sources of evidence and creates a logical bridge. *Fleischer*, 774 F. Supp. 2d at 877. Thus, the ALJ's decision concerning Fetsko and Vargo's opinion should not be disturbed.

28

### C.  Rice's In-Person Testimony

Rice next challenges the ALJ's analysis of his in-person testimony. (ECF No. 13 at 16). He contends that the ALJ "did not properly evaluate the medical evidence and make a defensible determination as to whether [his] testimony was credible." (ECF No. 13 at 18). At bottom, Rice believes that the ALJ exaggerated Rice's abilities to "shop, do his own laundry, clean his apartment, and attend church," and "ignored any testimony supported by the medical evidence [that] supported [his] continuing suicidal ideation and continuous pain at the site of his umbilical hernia. (ECF No. 13 at 18).

The regulations provide that

> statements about [a claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

20 C.F.R. § 416.929(a). The ALJ must first determine that the claimant has a medically determinable impairment. 20 C.F.R. § 416.929(b). Then, the ALJ must "[e]valuat[e] the intensity and persistence of [the claimant's] symptoms, such as pain, and determining the extent to which [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 416.929(c).

Social Security Ruling 16-3p (2017 WL 5180304 (S.S.A. Oct. 25, 2017)) guides the State Agency in evaluating subjective symptoms and testimony. Claimants may make statements on their behalf, such as hearing testimony, and such statements "may address the frequency and duration of the symptoms, the location of the symptoms, and the impact of the symptoms on the ability to perform daily living activities." SSR 16-3p, at *6. The State Agency "will consider an

individual's statements about the intensity, persistence, and limiting effects of symptoms, and …

evaluate whether the statements are consistent with objective medical evidence and the other

evidence." SSR 16-3p, at *6. As Rice notes, if "an individual's statements about the intensity,

persistence, and limiting effects of symptoms are consistent with the objective medical evidence

and the other evidence of record, we will determine that the individual's symptoms are more likely

to reduce his or her capacities to perform work-related activities for an adult…" SSR 16-3p at *8.

The inverse is also true: Inconsistent statements lead the ALJ to "determine that the individual's

symptoms are less likely to reduce his or her capacities to perform work-related activities or

abilities to function independently, appropriately, and effectively in an age-appropriate manner."

SSR 16-3p at *8. The ALJ will also "compare statements [that] an individual makes in connection

with the individual's claim for disability benefits with any existing statements the individual made

under other circumstances." SSR 16-3p at *8.

Ultimately, "credibility determinations regarding subjective complaints rest with the ALJ,"

and "those determinations must be reasonable and supported by substantial evidence." *Rogers*, 486

F.3d at 249. "An ALJ's findings based on the credibility of the applicant are to be accorded great

weight and deference, particularly since an ALJ is charged with the duty of observing a witness's

demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); 20

C.F.R. § 404.1529(a).

The ALJ concluded that "[s]upport for [Rice]'s assertions is weakened by the extent to

which his assertions of impairments-related symptoms are inconsistent with the other evidence in

the record. [Rice] does experience some limitations but only to the extent described in the [RFC]."

(ECF No. 11 at 28). The ALJ analyzed Rice's testimony and other statements, stating that

> [Rice] failed to provide a function report.[6] [He] did testify at his
> hearing and alleged disability from purportedly chronic pain[,]
> stemming from his history of abdominal pain. [He] conceded that[,]
> despite his alleged pain, … he had been able to walk the half hour
> to his hearing, had worked as recently as 2016 [(]lifting weights of
> up to 80 pounds[)], and had needed to lift only 30 to 50 pounds at
> his past work. [He] also admitted [that] he was able to walk to his
> methadone clinic each morning but then spent the rest of the day
> lying down at home. [He] testified that he was able to shop, do his
> own laundry, clean his apartment, and attend[] church. [He] testified
> that 'every moment' caused pain in his abdomen, and that any kind
> of exertion caused constant pain.

(ECF No. 11 at 25). The ALJ then thoroughly summarized Rice's physical and mental

impairments. (ECF No. 11 at 25-26). Having done so, the ALJ stated that Rice's "medically

determinable impairments could reasonably be expected to cause the alleged symptoms; however,

[his] statements concerning the intensity, persistence[,] and limiting effects of these symptoms are

not entirely consistent with the medical evidence and other evidence in the record…" (ECF No.

11 at 26).

"Discounting credibility to a certain degree is appropriate where an ALJ finds

contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127

F.3d at 531. In Rice's case, the objective medical evidence—as the ALJ noted—belies Rice's

subjective statements about his physical symptoms. For example, although Rice has frequently

complained of constant abdominal pain during emergency-department visits (*see* ECF No. 13 at

18-19), the objective medical evidence is at odds with many things, such as Rice's history of drug-

seeking behavior; a hernia-repair procedure that required only one stich; no long-term swelling or

redness at his hernia incision, which healed "with no signs of inflammation"; tomography imaging

---

[6] Rice asserts that the ALJ concluded that "Rice's testimony was not credible" simply because "he failed to provide a function report…" (ECF No. 13 at 18). This is not the case. The ALJ noted this deficiency in the record one time. (ECF No 11 at 24). As is discussed below, the ALJ justified his assessment of Rice's subjective statements with other substantial evidence.

that showed "no intra-abdominal abnormalities"; a full range of motion in all joints; imaging in October 2017 that showed no gastrointestinal-tract abnormalities, soft-tissue abnormalities, or recurrent hernias; and a "somewhat reduced strength in the upper and lower extremities" during a physical assessment—at which Rice appeared to give questionable effort. (ECF No. 11 at 25). In short, the objective medical evidence documents little, if any, limits on Rice's ability to perform typical work functions, which contrasts with Rice's testimonial assertions.

Although Rice asserts that the ALJ "ignored any testimony supported by the medical evidence [that] supported Rice's … continuous pain at the site of his umbilical hernia" (ECF No. 13 at 18), this is not the case because the ALJ reviewed those records, narrated them, and reasonably concluded that Rice's statements were inconsistent with the medical record. The ALJ's decision to give little credence to Rice's subjective statements about his physical symptoms is supported by substantial evidence and follows logically from the medical evidence.

Similarly, Rice's subjective statements about his mental health symptoms are somewhat inconsistent with the record's objective medical evidence. Rice noted that his symptoms were increasing, including his suicidal ideations stemming from chronic pain (ECF No. 11 at 56, 59). But the ALJ noted that the medical evidence showed that Rice sought mental health counseling inconsistently; appeared to be symptom free after two brief hospitalizations (during one of which Rice appeared to be medication-seeking); inconsistently alleging anxiety, depression, and despair symptoms; experiencing temporary and unidentifiably triggered panic attacks; had no desire to take psychiatric medications; felt no anxiety or depression in May 2018; and had no anxiety, but some depression, in June 2018. (ECF No. 11 at 26). The ALJ saw that body of evidence and concluded that Rice could be limited to "simple tasks and occasional public contact." (ECF No. 11 at 26). Rice's contention that his multiple trips to the hospital for suicidal ideations necessarily

demonstrates that the ALJ erred here is unpersuasive because the ALJ noted these trips and, considered them against the record as a whole, and logically reasoned that Rice's subjective statements were not consistent with greater restrictions.

The ALJ's conclusions fall within his zone of choice and is supported by substantial evidence; thus, his assessment here should not be disturbed. *Mullen*, 800 F.2d at 545.

### D. Rice's Ability to Perform Past Work

Rice also challenges the ALJ's decision at Step 4 that Rice "could return to his past job as a plastic mold operator and/or perform any other job in the national economy." (ECF No. 13 at 19 (formatting edited)). Although not explicitly stated, Rice objects to the ALJ's determination that Rice is physically capable of work at the medium exertional level. (ECF No. 13 at 19). To that end, Rice argues that his testimony and Fetsko and Vargo's functional assessment together nullify a medium-exertional-capacity finding because each believed that Rice could lift less than 20 pounds on a frequent basis, while work at the medium exertional level requires greater lifting ability. (ECF No. 13 at 19).

At Step 4, the claimant must prove that she cannot perform her past relevant work as actually or generally performed. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Studaway v. Sec'y of Health & Hum. Serv.*, 815 F.2d 1074, 1076 (6th Cir. 1978) (noting that the claimant "must prove an inability to return to his former type of work and not just to his former job"). In evaluating whether the claimant can perform her past relevant work, the ALJ must make specific factual findings regarding: (1) the claimant's RFC; (2) the physical and mental demands of the past job/occupation; and (3) whether the claimant's RFC would permit a return to his or her past job or occupation. Soc. Sec. Ruling 82-62, 1982 SSR LEXIS 27, at *10 (S.S.A. Jan. 1, 1982). The claimant's RFC represents their maximum physical and mental abilities, despite the

"impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." 20 C.F.R. § 416.945(a)(1).

The ALJ may ask a vocational expert to testify if the case has complex issues or if the ALJ must determine whether the claimant can perform her past relevant work. 20 C.F.R. § 416.960(b)(2). The ALJ "may use the services of vocational experts or vocational specialists, or other resources, such as the [DOT] … to obtain evidence … need[ed] to help [him] determine whether [the claimant] can do [her] past relevant work, given [her] residual functional capacity. A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 416.960(b)(2). If the ALJ asks the vocational expert whether there is a "discrepancy between [the vocational expert's] opinion and the DOT requirements," then the ALJ has complied with agency policy for using a vocational expert. *Beinlich v. Comm'r of Soc. Sec.*, No. 08-4500, 2009 WL 2877930, at *4 (6th Cir. Sept. 9, 2009)). In the Sixth Circuit, "the ALJ is under no obligation to investigate the accuracy of the [vocational expert]'s testimony beyond the inquiry mandated by SSR 00-4p." *Id.* Rather, that "obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the [vocational expert] and bring out any conflicts with the DOT." *Id.*

As an initial matter, Rice objects to the ALJ's purported failure to ask Macy, in his vocational-expert capacity, about Fetsko and Vargo's functional-capacity assessment. (ECF No. 13 at 20). Rice's allegation is without merit for two reasons. First, Fetsko and Vargo's functional-capacity assessment was not entitled to controlling weight, and, as discussed more fully above, the ALJ's decision to give it only little weight is supported by substantial evidence. Further, Fetsko and Vargo authored their opinion after the hearing (ECF No. 11 at 1592-98). Thus, the ALJ could

not have asked Macy about it at that time. Second, the ALJ, in a practical sense, satisfied Rice's request: He asked Macy to consider whether Rice could perform his past relevant work at the light exertion level (ECF No. 11 at 66), which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). That is the level at which Fetsko and Vargo rated Rice's lifting ability. (ECF No. 11 at 1597). In response, Macy opined that Rice could still perform his past relevant work as a plastics laborer—light exertional work—and that that opinion was consistent with the DOT and his experience. (ECF No. 11 at 66). Thus, the ALJ did not err in this manner.

Rice also objects to the ALJ's conclusion that Rice's past relevant work "was performed at the level of substantial gainful activity." (ECF No. 13 at 20). Rice argues that "[a] review of the earnings record [(ECF No. 11 at 193)] indicates that [Rice] earned only $7852.95 at Quality Blow Molding." (ECF No. 15 at 3). Rice notes that "according to ssa.gov, substantial gainful activity in 2007 was defined as earning in excess of $900 per month." (ECF No. 15 at 3). By Rice's calculation, "[i]f he worked at that job for more than nine months, it would not have been performed at the level of substantial gainful activity." (ECF No. 15 at 3). Rice's argument is flawed in two ways. First, Rice concedes that he did not raise this issue during the hearing. (ECF No. 15 at 3). The Commissioner notes, however, that Rice "has waived any objection" to this issue for that very reason—Rice's counsel could have objected when the ALJ considered Rice's past work at Quality Blow Molding as substantial gainful activity. (ECF No. 14 at 13). Under the five-step process, the claimant must prove to the Commissioner that she is disabled, including proving that she cannot perform her past relevant work at Step 4. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006). The Commissioner is correct that Rice had a fair opportunity to object on the record when the ALJ used his tenure at Quality Blow Molding as substantial gainful

35

activity. But he did not do so; thus, he has waived review of the issue here. Second, even if it were validly presented, Rice's computation is unsound. At the hearing, Rice noted that he worked full time and earned minimum wage (ECF No. 11 at 47), which earned him $6.85 per hour as of January 1, 2007,[7] and computes to $274 per week and $1,096 every four weeks—above the $900 monthly threshold for substantial gainful activity.

Rice also argues that the ALJ failed to consider any limitations caused by his thoracic aortic aneurysm. (ECF No. 13 at 20). The Commissioner argues that the ALJ reasonably found that this impairment was not severe because "there are no reports of symptoms from this condition." (ECF No. 14 at 14). The Court agrees with the Commissioner. An ALJ must "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Soc. Sec. Ruling 96-8p, 1996 SSR LEXIS 5 (S.S.A. July 2, 1996). The ALJ found that "[t]he claimant was diagnosed with 'aneurysmal dilation' of the thoracic aorta in November of 2017… There are no reports of symptoms from this condition and the undersigned finds it is not a severe impairment." (ECF No. 11 at 16). Rice has failed to offer any evidence that could lead this court to conclude that the ALJ reached this decision in error. Moreover, Rice fails to direct the court to any suggested limitations caused by his aortic aneurysm. (ECF Nos. 13 and 15). As there was no evidence of any symptom related to this condition, there was nothing further for the ALJ to consider.[8] Accordingly, this argument also lacks merit.

Because substantial evidence supports the ALJ's fashioning of Rice's RFC and his review

---

[7] OHIO CONST. art. II.34a (amended Nov. 7, 2006).

[8] "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p.

of Rice's prior substantial gainful activity at Step 4, the ALJ's findings should not be disturbed.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Rice's application for SSI be AFFIRMED.

DATED: November 17, 2020

*Carmen Henderson*

Carmen E. Henderson
United States Magistrate Judge

---

OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); see also *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).